IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| OJETTA REASE, | ) Civil Action No. 3:07-3601-MJP-JRM |
| Plaintiff, | ) |
| vs. | ) **REPORT AND RECOMMENDATION** |
| ZAX, INC., | ) |
| Defendant. | ) |

Plaintiff, Ojetta Rease ("Rease") filed this action on November 1, 2007. Defendant is Zax, Inc., d/b/a Zaxby's ("Zaxby's"). Rease alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("§ 1981").[1] On December 31, 2008, Zaxby's filed a motion for summary judgment. Rease filed a memorandum in opposition on January 29, 2009, and Zaxby's filed a reply on February 9, 2009.

## **FACTS**

1. Rease is a black female. She is married and has two teenage children. Rease is a high school graduate and attended college for two years. Plaintiff's Dep. 10, 12, 21.

2. Zaxby's District Manager James Bagwell ("Bagwell"), a white male, hired Rease as an Assistant Manager (salaried employee) in November 2005. She was assigned to work at Zaxby's Store # 144 on St. Andrews Road in Columbia, South Carolina. Initially, Rease

---

[1] Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

reported to General Manager ("GM") Julie Kelleher ("Kelleher"), a Hispanic female. See Plaintiff's Dep. 36-45, 284, Exs. 1-3.

3. Since 2003, Rease held similar positions at Church's, Chick-fil-A, and Popeye's. Plaintiff's Dep. 25, 26, 31, and 32.

4. On approximately June 27, 2006, Kelleher left work for medical reasons related to an accident at work and Rease was asked to take on GM duties until Kelleher returned. Plaintiff's Dep. 60, 95-96, 117; Bagwell Aff., Para. 8; Kelleher Aff., Para. 8.

5. Rease was frustrated with the level of training she had received because Kelleher herself was new and still learning. Plaintiff's Dep. 55-56.

6. Rease expressed concerns about how Bagwell treated Kelleher and believed that his treatment of her was related to her sex. She claims that Bagwell spoke to Kelleher like a child, reprimanded her in front of other managers and crew, and would make comments asking "how stupid" could Kelleher and her crew be and "how many times [do I have] to show you people these things?" Plaintiff's Dep. 67-68.

7. Rease also claims that Kelleher said she (Kelleher) had been seeing Bagwell[2] and that after they started seeing each other Bagwell began belittling her and speaking to her badly. Plaintiff's Dep. 63-64.

8. Kelleher admits that Bagwell was hard on her and would often correct and counsel her in front of other employees. She, however, states she witnessed him treating her employees as well as other GMs in the same manner. Kelleher Aff., Para. 5.

---

[2]Rease claims that Kelleher said that Kelleher and Bagwell were seeing each other. Kelleher denies telling Rease this, and both Kelleher and Bagwell deny any romantic relationship. Plaintiff's Dep. 63-64; Bagwell Aff., Para. 4; Kelleher Aff., Para. 6.

2

9. Bagwell emailed Rease and told her that Kelleher was going to be out indefinitely. In the interim, Rease was to act as GM. Plaintiff's Dep. 95-96; Bagwell Aff, Para. 8.

10. Rease claims that Bagwell promised to provide her with extra compensation (because she worked more than 70 hours on some weeks) and training to become a GM. Plaintiff's Dep. 153-155.

11. While Rease was acting as GM, Store # 144 performed poorly. The store received the fourth worst "mystery shopper" score in the area; failed an internal inspection on July 19, 2006; continued to have cleanliness problems after the failed inspection; and repeatedly received customer "Problem Reports" (including one each on July 29, July 30, and August 18, and two on August 24, 2006). Plaintiff's Dep., Exs. 8, 10, 12, 13, 15, 16, and 17-18.

12. Bagwell states that Rease struggled quite a bit with management skills, often repeatedly asking the same types of questions and staying in frequent contact not only with him, but with Kelleher, even though Rease had been told not to contact Kelleher as she was on medical leave. Bagwell Aff., Para. 9; Kelleher Aff., Para. 8.

13. Rease stated that she started realizing Bagwell was not going to promote her or make good on his promises. Plaintiff's Dep. 149. On August 20, 2006, Rease resigned her employment in an email to Bagwell on August 20, 2006. Rease's articulated reasons for her resignation were that Bagwell was never happy with her, did not assist her, and did not give her any positive feedback. She also claimed that she was "doing someone else's job" (presumably Kelleher's), and was upset that it was "still [Kelleher's] store." In the email, Rease made the general statement that Bagwell needed to give his female managers as much respect as he gave his male managers. Plaintiff's Dep., Ex. 19.

14. After sending her resignation email to Bagwell, she forwarded it to John Woods ("Woods"), Regional Manager for Zaxby's, to whom Bagwell directly reported. Shortly thereafter, Rease received a call from Bagwell in which he told her that he would not try to make her stay, but if she wanted, he would send her to train with Lionel Santos ("Santos"), a GM in Camden, South Carolina. Plaintiff's Dep. 173-175, Ex. 19; Bagwell Aff., Paras. 5-6, 12.

15. Rease believed that working with Santos would be the best way to get trained and that training with Santos is what Assistant Managers did prior to becoming GMs. She decided to remain with Zaxby's. The next time Bagwell visited Store # 144, he announced to crew members that Rease would be going to Camden in a couple of weeks to train. Plaintiff's Dep. 157, 175-176.

16. Shortly thereafter, Bagwell decided to place Richard "Kirby" Reynolds ("Reynolds"), a white male, in Store # 144 as the GM in light of Rease's struggles and her need for additional training. Reynolds started working for Zaxby's around the same time as Rease. Bagwell Aff., Para. 13, Ex. A; see also Plaintiff's Dep. 39-40.

17. Rease thought Reynolds was coming on a temporary basis to cover while she was in Camden. During a phone call with Reynolds, she learned he had been offered the GM position for Store # 144 on a permanent basis. Rease believed she deserved the job instead of Reynolds because she had more experience, had been with Zaxby's longer, and had served as interim GM. She sent another email to Bagwell, copying Woods, on September 2, 2006, complaining about Reynold's selection, Bagwell's treatment of his managers and crew, and that she had not received an employee review/evaluation from him. Additionally, Rease declared she was

4

no longer interested in training in Camden and stated she "[did not] want any GM spot." Plaintiff's Dep. 99-100, 176-177; Ex. 20.

18. Bagwell called Rease later that day to discuss the email, but Rease refused to speak to him because she did not want to talk to him at that point, had already clocked out, had been trying to contact him, and the call was not on her terms. Afterwards, Bagwell did not seek to discuss the issues with Rease and she did not bring them up again. Plaintiff's Dep. 221-223, Bagwell Aff., Para. 15.

19. On September 11, 2006, Rease sent an email to Woods without copying Bagwell. This email was meant to inform Woods of "what was going on" at Store # 144. Rease's email said that she had already gone to the "labor board" and the South Carolina Human Affairs Commission ("SCHAC") regarding Bagwell's "unfairness." She also wrote that Bagwell called store employees insulting names, he referred to the store as a "rat home" and the worst in the district, he did not explain why he chose Reynolds to be GM, she thought others had complained to the "labor board," and she thought Bagwell had slept with Kelleher.[3] Plaintiff's Dep. 281-282, Ex. 28.

20. On September 25, 2006, Rease wrote a note to Reynolds in which she criticized how he was running the store and asked him if he was just trying to hire white people. Reynolds Aff., Para. 6, Attachment A (Handwritten Note from Plaintiff). Toni Dew ("Dew"), a white female

---

[3]In her email, Rease also stated that the majority of employees at Store # 144 were black. In her deposition, Rease stated that Bagwell's name calling, while inappropriate in her view, was not raced based and that Kelleher had been subjected to the same types of comments which were often directed to the crew generally and included white employees. Plaintiff's Dep. 283-286.

5

cashier, told Rease that Reynolds asked the race of an applicant and shook his head when told that the applicant was black. Dew Dep. 13-15.[4]

21. There had been some general conversation among the managers and shift leaders in the store (Reynolds, Rease, Andre Anderson (black male), and Lewellyn Fletcher (black male)) about having a more diversified workforce - which Dew estimated to be 90% black), but Rease felt that asking a cashier about the race of a particular applicant was unprofessional. Rease admits there was never a "whites only" policy put in place and Store # 144 continued to accept applications from "everyone that came through the door." Dew Dep. 15-17; Plaintiff's Dep. 212-213, 217, 219.[5]

22. Rease said she believed Bagwell told Reynolds to take applications only from white people based on an alleged earlier (she does not provide the date) comment she heard Bagwell make about Raymond Boon, a black employee. She claims that Bagwell said he would not make Boon a cashier because he was "too big and black and will scare people." Rease never reported the alleged comment. Plaintiff's Dep. 214-215, 219-220.

23. On October 12, 2006, Rease filed a Charge of Discrimination with SCHAC (the "First Charge"). She alleged that she had been harassed based on her sex on a continuous basis since around July 1, 2006; was denied equal wages; and was denied a promotion. Plaintiff's Dep., Ex. 21.

---

[4]The parties dispute when this occurred, as is discussed further below.

[5]Reynolds states that while he was GM, the vast majority of the employees he hired to work at Store # 144 were black. Reynolds Aff., Para. 6.

6

24. Rease continued to work at Zaxby's. She did not have much interaction and barely spoke with Bagwell (she admits that when they did it was cordial) after she was no longer acting GM. Plaintiff's Dep. 197, 213; Bagwell Aff., Para. 16.

25. On January 24, 2007, Rease received a warning notice because an employee on her shift did not have a name tag and her shirt was not tucked in properly. Plaintiff's Dep., Ex. 22. Rease claims that Reynolds told her that Bagwell asked if Reynolds had any write-ups on her and when Reynolds said he did not, Bagwell told Reynolds that he (Bagwell) was going to lose his job because Reynolds had no write-ups on Rease. Plaintiff's Dep. 168.

26. On March 1, 2007, Reynolds issued a warning notice to Plaintiff for not taking food temperatures and not setting the alarm at closing. Plaintiff's De., Ex. 23. She received a warning on March 25, 2007 because she did not inform Reynolds about problems with the credit card machine. Plaintiff's Dep. Exs. 23 and 24. In her opposition memorandum, Rease also claims that she was issued warnings on June 15 and 17, 2007, for being late to work and leaving early. Plaintiff's Opp. Mem., Ex. D.

27. Store # 144 was not performing up to par, and Bagwell was harshly critical of Reynolds (even in front of other employees in the store). Plaintiff's Dep. 167-170; Reynolds Aff., Para. 8. Rease admits that Reynolds "was getting it worse than what [she] did" from Bagwell. Plaintiff's Dep. 100, 166.

28. On June 25, 2007, Reynolds received a GM Evaluation with an overall rating of 1.037946, which equated to "needs improvement" and bordered on an "unacceptable" rating. Reynolds was demoted and sent back to the Camden store to receive additional training as an Assistant Manager. Bagwell Aff. 19 and Attachment B.

29. On June 19, 2007, Rease received an Assistant Manager evaluation from Bagwell and received an overall rating of 1.438393, which equated to a "needs improvement" rating. She remained an Assistant Manager at Store # 144. Plaintiff's Dep. 231, Ex. 25; Bagwell Aff., Para. 19.

30. John Benenhaley, a white male, was brought in to replace Reynolds as GM. He had been an Assistant Manager at the Camden's Zaxby's immediately prior to his promotion. Plaintiff's Dep. 195; Bagwell Aff., Para. 20.

31. Plaintiff thought Benenhaley would repeat some of the struggles Reynolds had gone through, she did not agree with the manner in which Benenhaley addressed managers and crew (yelling and carrying on), but she had no problems working with him. Plaintiff's Dep. 234, 243.

32. On July 27, 2007, Bagwell terminated Rease. Woods had instructed District Managers at a meeting to review the Manager Activity Report for how the Zaxby's meal discount was being used. Wood's instruction triggered Bagwell's review of stores, including # 144's transaction report and related videotape. Bagwell Aff., Paras. 20 and 22; see Plaintiff's Dep., Ex. 27.

33. Zaxby's Meal Discount Policy provides that managers (exempt and nonexempt) receive a free meal each shift and the immediate family members of exempt managers can dine at Zaxby's at a fifty percent discount, provided the manager is present. Plaintiff's Dep., Ex. 26. Bagwell states that a manager could, if he or she chooses, give their free meal (while working) away to a family member rather than eat it themselves. If a manager worked an extraordinarily long shift, a second free meal might be appropriate. Bagwell Aff., Paras. 21, 24.

34. Rease states that a day or two before her termination, another employee, Donna Canty (black female), told Rease that Bagwell sat Canty down and warned her about giving food away to family members. Canty told Rease that Bagwell was going through the store video tape reviewing how managers were using their meal discount. See Plaintiff's Dep. 244.

35. When Rease arrived at Zaxby's on July 27, 2007, she was told that Bagwell was waiting for her in the office. Plaintiff's Dep. 244. Bagwell reviewed the transactions and asked Dew for her input on a transaction involving Rease because Dew had witnessed it. Dew reviewed the videotape and provided a statement. Dew Dep., Ex. 2.

36. Bagwell asked Rease about the use of her meal discount and showed her some video footage of her transactions on July 26, 2007. The first transaction showed Rease giving a 100% discount to a woman who, according to Rease, had a "comp card"[6] (short for "complimentary card") entitling her to a free meal. Rease claimed she did not know the woman, but had given her two applications for her sons who were with her and had gone to the lobby to show her sons how to fill out the applications. Bagwell also questioned Rease about the amount of time she spent in the lobby talking to the woman. There was no evidence of the "comp card" or the applications. They were not seen on the video, Dew did not see Rease use a "comp card" or give applications to the woman, and the alleged "comp card" and applications were nowhere to be found. Plaintiff's Dep. 135, 246-247, 251, 254-255; Dew Dep. 25-26, Ex. 2; Bagwell Aff., Paras 22-23.

---

[6] A "comp card" is given out to a Zaxby customer who may have had to wait too long for food, had a problem with their order, or may have otherwise had a less than desirable experience at Zaxby's. Plaintiff's Dep. 135.

9

37. Bagwell also discussed the fact that Rease had fed her sons, husband, and sister that day, giving them all a 100% discount. Plaintiff's Dep. 247; Bagwell Aff., Para. 23.

38. On August 3, 2007, Rease filed her second Charge of Discrimination with SCHAC (the "Second Charge") alleging discrimination on the basis of her sex and retaliation for engaging in protected activity. Plaintiff's Dep., Ex. 29.

## **DISCUSSION**

Rease alleges that Zaxby's retaliated against her in violation of Title VII after she filed her First Charge. She also claims that Zaxby's retaliated against her in violation of § 1981 for making complaints of race discrimination.[7] Zaxby's contends that Rease fails to establish a prima facie case of discrimination; it has articulated legitimate, nondiscriminatory reasons for its actions; and Rease fails to show pretext.

### A.  **Title VII Retaliation**

Rease alleges a claim under 42 U.S.C. § 2000e-3 for retaliatory discharge. Complaint at 5. To establish a prima facie case of retaliation under Title VII,[8] an employee must demonstrate that:

1) the employee engaged in protected activity;[9]

---

[7]In her Complaint, Rease also alleged that Zaxby's failed to promote her to the position of GM based on her sex. She has withdrawn this claim. See Plaintiff's Opp. Mem. at 2.

[8]This framework also applies to Rease's § 1981 retaliation claim (discussed below). See Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543 (4th Cir. 2003) (holding that a "plaintiff can prove illegal retaliation under ... § 1981" in the same manner as he establishes retaliation under Title VII); see also Bittle v. Electrical Ry. Improvement Co., 576 F. Supp. 2d 744, 753, n. 8 (M.D.N.C. 2008)(holding that Section 1981 and Title VII retaliation claims are analyzed under an identical legal analysis).

[9]Under Title VII, a plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well
(continued...)

2)      the employer took some adverse employment action against the employee; and

    3)      a causal connection existed between the protected activity and the adverse action.

See Lettieri v. Equant, Inc., 478 F.3d 640, 650 (4th Cir. 2007); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994)(Title VII). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

### (1)    **Prima Facie Case**

Zaxby's concedes that Rease's First Charge constitutes protected activity and her termination was a materially adverse action. Defendant's Motion for Summary Judgment at 20. The Company, however, argues that Rease's written notices and her performance evaluation were not materially adverse actions. Zaxby's contends that Rease fails to establish her prima facie case of retaliation because she has not shown a causal connection between the First Charge and the adverse employment action(s). In her opposition memorandum, Rease asserts that she has clearly met her prima facie case by showing she engaged in protected activity and suffered adverse employment actions. Plaintiff's Opp. Mem. at 7.

---

[9](...continued)
as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Indus., Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

### (a) **Adverse Action**

Zaxby's contends that Rease fails to show that her written notices or her performance evaluation were adverse employment actions for establishing her prima facie case. The Supreme Court has clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts, stating that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67. Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation marks and citations omitted).

Rease fails to show that her warning notices[10] or performance evaluation were adverse employment actions because they are not actions which would deter a reasonable employee from initiating a charge of discrimination. She has not shown that these actions had an adverse impact on her job title, salary, benefit, or any other material aspect of her employment. See Parsons v. Wynne, 221 Fed. Appx. 197, 199 (4th Cir. 1997)(unpublished)(adverse performance evaluation and change in work schedule not materially adverse actions); Washington v. Norton, 2007 WL 1417290, *4 (N.D.W.Va. May 11, 2007)(unpublished)("Reprimanding an employee for unprofessional conduct or warning an employee about poor performance by letter does not alter the employee's daily work

---

[10]In her Second Charge, Rease only claimed that she had been "harassed" beginning November 2006, disciplined on May 12, 2007; and discharged on July 27, 2007. Plaintiff's Dep., Ex. 29.

12

environment."); Gordon v. Gutierrez, 2007 WL 30324, *9 (E.D.Va. 2007)(unpublished)("circumstances of verbal counseling...would not discourage a reasonable employee"); and Zackrie v. Lockheed Martin, Corp., 2006 WL 2849767, *8 (D.Md. 2006)(documenting areas for improvement and tracking absences insufficient). Rease testified that she was not demoted, her title was not changed, her schedule did not change in a way that was adverse to her, and her salary was not affected by the written notices. Plaintiff's Dep. 197, 241-242. She also admitted that her June 2007 performance evaluation did not result in a change in her salary, title, schedule, or any other term of employment. Plaintiff's Dep. 230-231.

### (b) Causal Connection

Zaxby's contends that Rease fails to show a causal connection between the protected activity (First Charge) and the alleged adverse action(s). Rease appears to argue that she has shown a causal connection based on temporal proximity.

Rease fails to show a causal connection based on temporal proximity alone because she was terminated (July 27, 2007)[11] more than nine months after her protected conduct (the First Charge on October 12, 2006).[12] See, e.g., Pascual v. Lowe's Home Ctrs., Inc., 193 Fed. Appx. 229, 232 (4th

---

[11]Rease may be trying to argue proximity based on the date of her opposition to the alleged "whites only" application policy, which she claims occurred in November of December 2006. As discussed further below, her own note concerning the incident was written in September 2006, not in November or December. In her Complaint, Rease alleges retaliatory discharge under Title VII based on the First Charge (not on any other protected activity). See Complaint at 5 ("after filing her charge of sex discrimination with SCHAC...."). Additionally, Rease did not allege in her Second Charge that she engaged in any protected activity other than her previous complaint (First Charge). See Plaintiff's Dep. Ex. 21.

[12]Even if her written notices or her performance evaluation were considered adverse employment actions, Rease fails to show a causal connection based on proximity as the first written warning (January 24, 2007) was over three months and her performance evaluation (June 19, 2007) occurred
(continued...)

Cir. 2006)(unpublished)(holding that three to four months between the termination and protected activities is too long to establish a causal connection by temporal proximity alone); Shields v. Federal Express Corp., 120 Fed. Appx. 956 (4th Cir. 2005)(unpublished)(three to four months was insufficient to raise an inference); Garrett v. Lujan, 799 F. Supp. 198, 202 (D.D.C.1992)(concluding that the passage of nearly a year precluded an inference of causal connection); Parrott v. Cheney, 748 F. Supp. 312 (D.Md.1989)(even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context), aff'd per curiam, 914 F.2d 248 (4th Cir. 1990).

Rease argues that she began receiving written notices shortly after engaging in protected activity. She, however, fails to show a causal connection, as she admittedly had performance problems prior to and after the protected activity. When performance problems exist before and after a protected activity, counseling on those performance problems is not sufficient to meet the prima facie case. See Ziske v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008)(holding that "[w]orkers are shielded from retaliation on account of their assertion of rights protected under Title VII. But a complaining worker is not thereby insulated from the consequences of insubordination or poor performance.").

Although Rease appears to dispute the extent of the problems for which she received written notices, she does not dispute that the incidents occurred. Rease admitted that she had an employee who did not have her shirt tucked in and was not wearing her nametag, and that the store failed a mystery shopper's evaluation. Plaintiff's Dep. 198, Ex. 22. Although she argues that Reynolds only

---

[12](...continued)
over eight months after the protected conduct (First Charge).

talked to her about failing to take food temperatures and not about setting the alarm, Rease did not dispute that these incidents occurred. See Plaintiff's Dep. 199, Ex. 23. Rease testified that there was a problem with a credit card machine, which then was fixed, and then stopped working again. She claims that she did not have time to call Reynolds to tell him that it had stopped working again, but does not dispute that the incident occurred. See Plaintiff's Dep. 200-201, Ex. 24. Rease complained that she received warnings on June 15 and 17, 2007, in which she was written up for being late on one occasion and leaving early on another when she was not actually scheduled to be working. These warnings were not, however, made a part of her deposition and she has not shown that they were made part of her personnel file.

### (2) Legitimate, Nondiscriminatory Reasons

Even if Rease could establish her prima facie case, Zaxby's has provided legitimate, nondiscriminatory reasons for its actions. Specifically, Zaxby's asserts that Rease was written it for specific performance issues, she received an unfavorable review based on performance issues, and she was terminated for giving away free food to family members and an unidentified woman.

### (3) Pretext

Rease argues that she has shown that Zaxby's reasons for her termination are pretext for retaliation because she was never disciplined prior to filing her First Charge, she was not given an evaluation until after a SCHAC investigator pointed out that she had not been evaluated, and the "free food" policy was enforced in a disparate fashion.

Rease appears to argue that her written notices were pretext for retaliation because Reynolds told her that Bagwell asked if Rease had any write-ups and claimed that he (Bagwell) was going to lose his job because Rease had no write-ups in her file. First, as discussed above, Rease fails to show

15

that she did not have performance problems that warranted written notices. She also admits that other managers were written up for problems with taking food temperatures. Plaintiff's Dep. 199. Bagwell denies Rease's allegations, states that Reynolds was having ongoing issues with Rease, and states he told Reynolds that if he had ongoing issues with Rease or any other employee he needed to document it. Bagwell Aff., Para. 16. Reynolds stated he talked to Bagwell about performance problems he was having with Rease and that:

> Bagwell never asked me to specifically find things to write Ms. Rease up for, he just wanted everyone held accountable. While I did have write-ups on Ms. Rease, I had them on others, including Andre Anderson (black male) and Justin Mahaffey (white male).

Reynolds Aff., Para. 7. Rease recounted a situation when she was acting GM and Bagwell told her to write up an employee who had given poor customer service. Plaintiff's Dep. 133-134. She has provided nothing to support her belief that Bagwell told Reynolds to write her up for or fabricate reasons to give her written notices for poor performance.

Rease argues that she has shown pretext because her poor evaluation was done in response to the SCHAC investigation. She testified that a woman named "Cassandra" at SCHAC told her that Zaxby's had been instructed to have Bagwell do evaluations. Plaintiff's Dep. 192. Cassandra has not been further identified and has not testified to the alleged fact. Thus, such hearsay cannot be relied upon to defeat Defendants' motion for summary judgment. See Maryland Highways Contractors Assoc., Inc. v. Maryland, 933 F.2d 1246, 1251-1252 (4th Cir. 1991)(holding that hearsay evidence that would not be admissible at trial cannot be considered on a motion for summary judgment).

Rease does not dispute that Store # 144 had problems and that she had performance issues. Further, Bagwell states that Rease, as well as the rest of the salaried managers in his district, also

16

received an evaluation around the same time. Bagwell Aff., Para. 19. Rease has presented nothing other than her own opinion to show that these evaluations were not performed. Further, she does not dispute that Reynolds received an evaluation around the same time, Reynolds received a lower score, and Reynolds was demoted and transferred as a result of the poor evaluation. See Bagwell Aff., Ex. B.

Rease next argues that she has shown pretext because discipline for violating the "free meal" policy was applied in a disparate manner. First, although Rease claims that the terms "immediate family" and "within reason" are not defined, she does not dispute that Zaxby's had a written policy providing that exempt managers received a free meal, within reason, for each shift they worked and that their immediate family received a fifty percent discount. She also does not dispute that on the day in question she gave her sons and her sister free meals and that she later gave her husband a free meal. Plaintiff's Dep. 251.

Rease argues that she told Bagwell of other managers who gave their families free food, including Kelleher, Andre Anderson, and Canty (who on the same day gave her son and sister free food). She, however, fails to show that Bagwell knew of the other managers (other than Canty) giving away free food to their families. Bagwell states that he spoke with Canty and concluded that because she had given her free meal away to a member of her family and had not eaten that day, she had not violated the policy. Bagwell Aff., Para. 24. Rease also argues that Canty told her about an incident where an Assistant Manager named Justin brought four or five of his friends to the store and gave them free food. She states that she reported the incident to Reynolds who in turn reported it to

17

Bagwell; Bagwell told Reynolds to write Justin up, which Reynolds did; and Justin was not fired. Plaintiff's Dep. 259-263.[13]

Even if Rease could show that Bagwell knew of other managers who gave food away free to their families and were not terminated, she fails to show disparate discipline because she was also terminated for giving free food away to the unidentified woman the same day. Although Rease claims the woman had a "comp card," there was no indication on the videotape that the card was given to the cashier and Rease never produced the card.

## B. § 1981

Rease alleges that Zaxby's terminated her employment in retaliation for her complaints of race discrimination in violation of § 1981. Zaxby's contends that Rease fails to establish a prima facie case and that it has articulated legitimate, nondiscriminatory reasons and Rease fails to show pretext.

### (1) Prima Facie Case

For purposes of summary judgment only, Zaxby's does not dispute that Rease engaged in protected conduct by questioning Reynolds whether there was a "whites only" application/hiring policy for Store # 144. See Defendant's Motion for Summary Judgment at 26. The parties disagree as to when this occurred. Zaxby's argues that it occurred in September 2006 and Rease claims it occurred in November or December 2006.

In her deposition, Rease did not testify as to the date the opposition activity took place. Reynolds states that "Rease wrote me a note asking if I was going to hire any white people (*See*

---

[13]Rease testified that she saw a videotape of Justin in the lobby with his friends. She admits, however, that she was not present at the time of the incident. Additionally, she did not witness any conversation between Bagwell and Justin. Plaintiff's Dep. 259-263.

18

Attachment A, 9/25/06 Note)." Reynolds Aff., Para. 6. The handwritten note is dated 9/25/06 and signed with Rease's nickname "Jetta." The note provides, in part:

> Also, let me know if you are just trying to hire white people only at this point, because you can't question people about if the applicant is white, black, green - or - whatever. That's not being fair, and I don't tolerate that, so I hope what's being said about you is untrue.

Reynolds Aff., Attachment A (emphasis in original). In her opposition memorandum, Rease asserts that her opposition activity occurred in November or December 2006 based on an unsworn statement from Dew. During her deposition, Dew was questioned about the statement (signed on November 7, 2007), which contained the following paragraph:

> Part of my job as Cashier was to accept employment applications from people. After accepting the application, I would take it to the manager on duty. On one occasion, which I believe to be in or about November or December 2006, I gave Reynolds an application. When I handed him the application he asked if the applicant was white or black. When I told him he was black, he said damn it.

Dew Dep., Ex. 1. Dew said she did not remember writing the statement, but remembers the incident, and does not remember Reynolds saying "damn it." Instead she claims that Reynolds asked her whether an applicant (from whom she had just taken an employment application) was white or black and when she said the applicant was black, Reynolds shook his head back and forth. Dew stated that she did not type the statement and did not know who typed it. She testified that Rease brought the statement to her and asked her to sign it. Dew Dep. 10-11.

As discussed above, the only materially adverse action which Rease has shown for purposes of her prima facie case is her termination. She fails to show causation. Even if the protected activity occurred in December 2006 (conflicting with her own handwritten statement), she cannot show a causal connection based on proximity because she was not terminated until approximately seven months later. Her performance evaluation, even if it was an adverse employment action, did not

occur until approximately six months after the protected activity. Although Rease might be able to show causation based on proximity as to her warning notices (if the later date is used), she has not shown that the notices were adverse employment actions (as discussed above) and has not presented anything to dispute that her notices were based on her performance problems.

### (2)     Legitimate, Nondiscriminatory Reasons/Pretext

As discussed above, even if Rease could establish her prima facie case of retaliation under § 1981, Zaxby's has articulated legitimate, nondiscriminatory reasons for its actions and she fails to show pretext.

## CONCLUSION

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 29) be **granted.**

Joseph R. McCrorey
United States Magistrate Judge

August 24, 2009
Columbia, South Carolina